**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JPMORGAN CHASE BANK, N.A.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ALECTA REAL ESTATE NORTH** | ) | |
| **MICHIGAN AVENUE, INC., a Delaware** | ) | |
| **corporation, ALECTA REAL ESTATE** | ) | |
| **USA, INC., a Delaware corporation,** | ) | **No. 08 C 3018** |
| **ALECTA PENSIONSFÖRSÄKRING,** | ) | |
| **ÖMSESIDIGT, a Swedish company and** | ) | |
| **ALECTA REAL ESTATE USA, LLC, a** | ) | **Judge Ronald A. Guzmán** |
| **Delaware limited liability corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| **ALECTA REAL ESTATE NORTH** | ) | |
| **MICHIGAN AVENUE, INC., a Delaware** | ) | |
| **corporation, ALECTA REAL ESTATE** | ) | |
| **USA, INC., a Delaware corporation,** | ) | |
| **ALECTA PENSIONSFÖRSÄKRING,** | ) | |
| **ÖMSESIDIGT, a Swedish company and** | ) | |
| **ALECTA REAL ESTATE USA, LLC, a** | ) | |
| **Delaware limited liability corporation,** | ) | |
| | ) | |
| **Defendants/Counter-Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JPMORGAN CHASE BANK, N.A.,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

JPMorgan Chase Bank, N.A., has sued defendants for breach of contract, money wrongfully

had and received and a declaration that it is not liable to defendants for certain expenses associated

with its lease of property from defendants. The case is before the Court on the parties' cross-motions for partial summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth below, the Court denies plaintiff's motion and grants in part and denies in part defendants' motion.

## Facts

JPMorgan Chase Bank N.A. is the successor to Bank One, which was the successor to First National, (collectively, "the Bank") and is a national banking association with a principal place of business in New York. (Pl.'s Resp. Defs.' Stmt. Uncontested Facts ¶ 1.) Alecta Real Estate North Michigan, Inc., formerly known as SPP Real Estate (North Michigan), Inc., was a Delaware corporation with its principal place of business in Connecticut. (*Id.* ¶ 2.) Alecta Real Estate USA, Inc. was a Delaware corporation with its principal place of business in California. (*Id.* ¶ 3.) Alecta pensionsförsäkring, ömsesidigt ("Alecta Sweden"), is a Swedish company with its principal place of business in Sweden. (*Id.* ¶ 4.) Alecta Real Estate USA, LLC, is a Delaware limited liability company, the only member of which is Alecta Sweden. (*Id.* ¶ 5.)

Formerly, the Bank owned the building at 605 North Michigan Avenue in Chicago, part of which it occupied. (*Id.* ¶ 7.) In May 1998, the Bank sold the building to defendants in a transaction that also required defendants to lease back to the Bank the space it occupied in the building. (*Id.* ¶¶ 8-9.) The parties executed the sale and purchase agreement, which required their subsequent execution of a lease, on May 18, 1998. (*See* Pl.'s Stmt. Uncontested Facts, Ex. BB, Sale & Purchase Agreement § 15(a)(xiv).) The parties executed the lease, from which this suit arises, on May 29,

1998.  (Pl.'s Resp. Defs.' Stmt. Uncontested Facts ¶ 10; Compl. ¶ 10; *id.*, Ex. 1, Lease; Answer ¶ 10.)

Section three of the lease, entitled "Additional Charges," states:  "Tenant shall pay as 'Additional Charges' the amounts determined pursuant to subparagraphs B through D of this Section 3." (Compl., Ex. 1, Lease § 3.)  Subparagraph A defines six terms used in subparagraphs B through D, including "Operating Expenses" and "Taxes."  (*Id.* § 3A(i)-(vi).)  "Operating Expenses" is defined as "all expenses, costs and disbursements actually paid by Landlord and properly chargeable for the applicable Lease Year in connection with the management, operation, insurance, maintenance and repair of the office or retail portion of the Building as the case may be, and Land," except for, among other things, "Taxes." (*Id.* § 3A (ii)(a)-(u).)  The lease defines "Taxes" as "real estate taxes and assessments, both general and special, assessed or imposed with respect to the Land or the Building becoming due and payable during the Term" and states that "Landlord shall make an equitable allocation of Taxes between the office and retail portions of the Building." (*Id.* § 3A(iv).) Subparagraph B, entitled "Expense Adjustment" contains six parts, the first of which states:

> Tenant shall pay to Landlord . . . as Additional charges [sic], an amount ("Expense Amount") equal to (i) Tenant's Retail Percentage of the amount of Operating Expenses incurred with respect to the retail portion of the Building for each Lease Year plus (ii) Tenant's Office Percentage of the amount of Operating Expenses incurred with respect to the office portion of the Building for each Lease Year.

(*Id.* § 3B(i).)  The sixth part states:  "Landlord agrees to pay taxes when due . . . .  If Landlord is successful in contesting any Taxes and obtains a refund, such refund shall be applied to reduce Taxes for the year in which the amount is received by Landlord." (*Id.* § 3B(vi).)

3

Since the sale-lease back transaction was executed, ownership of the building has been transferred to and among various Alecta entities. (Pl.'s Resp. Defs.' Stmt. Undisputed Facts ¶ 13.) The building is currently owned by Alecta Real Estate USA, LLC. (*Id.*)

The Bank has sued defendants for a declaration that the lease does not require it to pay real estate taxes or certain other expenses and breach of contract or, alternatively, recovery of money wrongfully had and received. Defendants say the Bank is entitled to no relief and ask the Court to reform the lease to conform to the parties' intent.

## Discussion

To prevail on a summary judgment motion, "the pleadings, the discovery and disclosure materials on file, and any affidavits [must] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

Both parties move for summary judgment on the Bank's claim for a declaration that the lease does not require it to pay real estate taxes. To resolve these motions, the Court must interpret the lease, a question of law appropriate for summary judgment. *Premier Title Co. v. Donahue*, 765 N.E.2d 513, 516 (Ill. App. Ct. 2002). The goal of contract interpretation "is to give effect to the

intent of the parties." *Id.* If the contract is unambiguous, that intent is derived solely from its language, which is "given its plain and ordinary meaning." *Id.*

Such is the case here, the Bank asserts, because the lease requires it to pay certain operating expenses, a term that is explicitly defined to exclude taxes. In the Bank's view, the provisions requiring defendants to apportion taxes between the retail and office portions of the building and to apply tax refunds to the year in which they are received do not render the lease ambiguous. Rather, the Bank argues that any conflict between those provisions and the tax exclusion can be resolved by ordinary principles of contract interpretation.

The Bank cites a number of cases to support its position, including *AM International v. Graphic Management Associates, Inc.* and *Grevas v. U.S. Fidelity & Guaranty Co.*, neither of which involved the interpretation of conflicting contract provisions. *See AM*, 836 F. Supp. 487, 489-90 (N.D. Ill. 1993) (refusing to interpret clear, consistent provisions as including a contingency not addressed by them), *aff'd*, 44 F.3d 527 (7th Cir. 1995); *Grevas*, 604 N.E.2d 942, 944 (Ill. 1992) (applying the more specific of two, non-conflicting contract provisions). Conflicting provisions were at issue in *Lima Lake Drainage District of Adams County v. Hunt Drainage District of Hancock County*, but the court held that they rendered the contract ambiguous and used extrinsic evidence to determine the parties' intent. 561 N.E.2d 1351, 1354 (Ill. App. Ct. 1990). The contract in *McDonald's Corp. v. Butler Co.* also had conflicting terms, but the court was able to reconcile them and give effect to both. 511 N.E.2d 912, 917-18 (Ill. App. Ct. 1987) (interpreting a contract with a provision allowing only retail development for five years and another permitting residential development without any time limitations as allowing residential development after five years).

The only case that seems to support the Bank's argument is *Abt v. Mazda American Credit*,

25 F. Supp. 2d 860 (N.D. Ill. 1998). The contract in that case was a car lease with one provision that said the total of "Other Charges" due the lessor was $0.00 and another that said the lessee was required to pay a disposition fee of $350.00 at the end of the lease. *Id.* at 862. The court said the question was "whether the term 'Other Charges' in paragraph 9 . . . include[s] the disposition fee [in paragraph 20]," and held that the answer was "yes." *Id.* The court did not, however, view the resulting conflict as one between two "other charges" provisions. Rather, the court said its interpretation resulted in a conflict between "an implied disposition fee of $0.00 (paragraph 9) and an express disposition fee of $350.00 (paragraph 20)." *Id.* at 863. The court held that the latter should be "given its full effect because the term 'disposition fee' is more specific than 'Other Charges.'" *Id.*

The Court respectfully disagrees with the *Abt* court's analysis. The conflict yielded by the court's interpretation of "Other Charges" was between an express "other charges" term of $0.00 and an implied "other charges" term of $350.00. Thus, the specific provision was the express term of $0.00, not the implied term of $350.00.

In any event, the provisions at issue in *Abt* were in two different sections of the contract, one addressing the lessee's liabilities and the other setting forth the conditions for terminating the lease. Here, however, the conflicting provisions appear in a single section that purports to describe a single liability – "Additional Charges." (*See* Compl., Ex. 1, Lease, § 3.) Yet, the section is fraught with contradictions, requiring defendants to allocate taxes, for which the Bank is not liable, between the building's office and retail space, and instructing them to reduce the Bank's non-existent tax liability for any lease year by the amount of any tax refund defendants obtain. (*Id.* § 3A (ii)(a), (iv), 3B(i), (vi).)

The Bank contends that the inconsistency can be resolved by applying a contract-interpretation principle described this way by the *McDonald's* court:

> Where one intention is expressed in one clause of an instrument and a different, conflicting intention appears in another clause of the same instrument, full effect should be given to the clause which is the more principal and specific, and the general clause should be subjected to such modification or qualification as the specific clause makes necessary.

511 N.E.2d at 917.  Because the definition of operating expenses specifically excludes taxes and the other sections merely suggest that it is liable for them, the Bank argues that the specific provision should prevail.

But the purpose of lease section three, as it plainly states, is not to define operating expenses, but to delineate all of the Bank's non-rent obligations:  "In addition to the Rent, Tenant shall pay as 'Additional Charges' the amounts determined pursuant to Subparagraphs B through D of this Section 3."  (Compl., Ex. 1, Lease § 3.)  Subparagraph A defines certain terms used in subparagraphs B through D, including operating expenses, *i.e.*, expenses other than taxes, and taxes, *i.e.*, real estate taxes equitably allocated between retail and office space.  (*Id.* § 3A(ii), (vi).)  However, the actual components of "Additional Charges," including the "Expense Adjustment" provision that tells defendants how to apply tax refunds, are set forth in the subparagraphs B through D.  (*Id.* § 3B-D.)  Given the purpose and structure of section 3, the definition of operating expenses is not more "principal and specific" than the definition of taxes.  *McDonald's*, 511 N.E.2d at 917.

Moreover, allowing the former to trump the latter would render meaningless the lease's equitable tax allocation and refund provisions, violating another basic tenet of contract interpretation.  *See Premier Title*,765 N.E.2d at 516, 518 (stating that a contract is to be construed so that "none of its terms [is] regarded as mere surplusage").  Because the section 3 is susceptible

to two reasonable interpretations, that additional charges include taxes and exclude taxes, it is ambiguous. *Carey v. Richards Bldg. Supply Co.*, 856 N.E.2d 24, 27 (Ill. App. Ct. 2006).

In light of the ambiguity, the Court turns to extrinsic evidence, which includes "the facts and circumstances surrounding the making of the contract" and the parties' "contemporaneous or subsequent acts," to determine their intent. *Lima Lake*, 561 N.E.2d at 1354. It is undisputed that in 1998, the Bank hired a brokerage firm to find a party willing to enter into a sale-lease back transaction for the building. (Pl.'s Resp. Defs.' Stmt. Uncontested Facts ¶¶ 7-9, 14.) The broker in charge of the transaction, Kenneth Szady, gave an offering memorandum that he had prepared and the Bank had approved to prospective buyers, including defendants. (Pl.'s Resp. Defs.' Stmt. Uncontested Facts ¶¶ 14-15, 18-20.) In relevant part, the memorandum states:

> . . . . All office and retail rents are quoted on a net basis with full pass throughs of operating expenses and real estate taxes. Lower level rent is quoted on a gross basis with no passthroughs [sic] of expenses or taxes. . . .
>
>  . . . .
>
> All net lease tenants pay their proportionate share of actual annual operating expenses and real estate taxes. . . . According to the tenant leases, each tenant's proportionate share of expenses and taxes is determined via a specific calculation. . . .
>
>  . . . .
>
> Although the North Michigan Avenue office market has a mixture of gross and net leases, we have assumed the space at **605 North Michigan Avenue** is leased on a net basis. Thus, new office and retail tenants are assumed to sign net leases that allow for the full pass through of operating expenses and real estate taxes. . . .

(*Id.*, Ex. EE, Offering Memorandum at AL 1-200-01; *see* Defs.' Stmt. Undisputed Facts, Ex. C, Szady Dep. at 23-26 (testifying that the Bank had authorized him to tell potential buyers that it "would pay [its] pro rata share of the real estate taxes").)

In April 1998, defendants began negotiating the sale-lease back transaction with the Bank. (*See* Pl.'s Resp. Defs.' Stmt. Uncontested Facts, Ex. OO, Lease Draft #1 (dated April 22, 1998).) JoAnn Shrier, a Bank vice president and real estate lawyer, and Dennis Somers, a Bank vice president or transactions manager represented the Bank in the negotiations. (*Id.* ¶¶ 21-23; Pl.'s Resp. Defs.' Stmt. Add'l Facts ¶ 2.) J. Walter Berger, who was two levels above Somers in the Bank's hierarchy, participated in the Bank's decision to enter into the lease. (Pl.'s Resp. Defs.' Stmt. Add'l Facts ¶¶ 1-3.) Kenneth Plifka, a lawyer, and Robin Nack, an asset manager, represented defendants. (Pl.'s Resp. Defs.' Stmt. Uncontested Facts ¶¶ 24-25.) During the negotiations, Shrier and Plifka exchanged eight drafts of the lease. (Defs.' Resp. Pl.'s Stmt. Add'l Facts ¶ 12.)

The first draft of the lease contains a provision entitled "Expense and Tax Adjustment," which states:

> . . . Tenant shall pay as Additional Charges (a) an amount (the "Expense Amount") equal to Tenant's Expense Share of the Operating Expenses for each Lease Year of the Term, and (b) an amount (the "Tax Amount") equal to Tenant's Tax Share of the Taxes for each Lease Year of Term.

(Pl.'s Resp. Defs.' Stmt. Uncontested Facts, Ex. OO, Lease Draft #1 § 3B(i).) The draft defines "Operating Expenses" as "all expenses, costs and disbursements actually paid by Landlord . . . in connection with the management, operation, insurance, maintenance and repair of the Building and Land" except, among other things, taxes. (*Id.* § 3A(ii)(a).) It defines "Tenant's Expense Share" and "Tenant's Tax Share" as "the percentage calculated by dividing the rentable area specified . . . by the total rentable area of the Building" and states that defendants must apply any tax refund "to reduce taxes for the year in which the amount is received by Landlord." (*Id.* § 3A(v), B(vii).) The same provisions appear in the second and thirds drafts. (*Id.*, Ex. PP, Second Draft § 3A(ii)(a), (v), B(i), (vii); *id.*, Ex. QQ, Third Draft, § 3A(ii)(a), (v), B(i), (vii).)

However, the fourth draft, which Shrier faxed to Plifka and Somers on May 14, 1998, does not contain the "Expense and Tax Adjustment" provision set forth in the first three. (*See id.*, Ex. RR, Lease Draft # 4 § 3A(v); Pl.'s Resp. Defs.' Stmt. Add'l Facts ¶ 40.) Rather, Shrier replaced it with a provision entitled "Expense Adjustment" that states:

> Tenant shall pay . . . as Additional charges [sic], an amount equal to (i) Tenant's Retail Percentage of the amount of Operating Expenses incurred with respect to the retail portion of the Building for each Lease Year plus (ii) Tenant's Office Percentage of the amount of Operating Expenses incurred with respect to the office portion of the Building for each Lease Year.

(*Id.* § 3B(i).) She also struck all references to "Tax Amount," a term used in the defunct "Expense and Tax Adjustment" provision of the previous drafts. (*Id.* § 3A(u); Defs.' Resp. Pl.'s Stmt. Add'l Facts ¶ 24.) Though Shrier cannot recall, Plifka says she added the equitable-tax-allocation language as well. (Def.'s Stmt. Undisputed Facts, Ex. B, Plifka Dep. at 80-81; Pl.'s Resp. Defs.' Stmt. Uncontested Facts, Ex. II, Shrier Dep. at 79-80.) In any event, Shrier did not change the definition of operating expenses to include taxes or eliminate the provision that dictates how defendants are to apply tax refunds. (Defs.' Resp. Pl.'s Stmt. Uncontested Facts, Ex. RR, § 3A(ii)(a), B(vi).) The lease the parties executed on May 29, 1998, and attached to the sale and purchase agreement they signed on May 18, 1998, is the same as the fourth draft in these respects. (*Id.* ¶¶ 7-10; *id.*, Ex. AA, Lease; *id.*, Ex. BB, Sale & Purchase Agreement.)

Plifka testified that the parties intended the Bank to be liable for taxes but failed to amend the definition of operating expenses to include them when Shrier's retail/office distinction was incorporated into the fourth draft. (Defs.' Stmt. Undisputed Facts, Ex. B, Plifka Dep. at 129-36.) Plifka also testified that Shrier told him "several times" during the negotiations and on the day of closing that the Bank would be liable for its pro rata share of taxes, she never asked for that liability

to be eliminated and the two "talked in great detail about how to properly allocate the real estate taxes." (*Id.* at 72-73, 109, 114-15, 133-35.)

Neither Shrier, Somers nor anyone else testified that the Bank did not intend to be liable for taxes. On the contrary, Somers thinks the Bank intended to have such liability and Shrier simply cannot recall. (Defs.' Stmt. Undisputed Facts, Ex. D, Shrier Dep. at 95; *id.*, Ex. E, Somers Dep. at 105-07.) Somers' belief is reflected in a May 22, 1998 memorandum about the transaction that he prepared for Berger which, in the summary of lease terms, states: "Tax and Operating Expenses: Proportionate Share for Floors 1, 2 and 4." (*Id.*, Ex. G, 5/22/98 Mem. at 3; *id.*, Ex. E, Somers Dep. at 32-34, 130-36; *see* Pl.'s Resp. Defs.' Stmt. Undisputed Facts ¶¶ 27-28.) Berger gave the memorandum to his boss, Bill DeKracker, and the Bank's administrative committee, which was responsible for approving the transaction and included CEO Vern Istock. (Pl.'s Resp. Defs.' Stmt. Undisputed Facts ¶¶ 28, 30; Defs.' Stmt. Undisputed Facts, Ex. G, 5/22/98 Mem. at 1; *id.*, Ex. E, Somers Dep. at 32-34, 130-36.) Somers said the committee approved the lease as it is described in the memorandum. (*Id.*, Ex. E, Somers Dep. at 33-34.)

Because the memorandum was issued after the parties' May 18, 1998 execution of the sale agreement, which required them to sign a lease "in the form attached hereto," the Bank says it sheds no light on its intentions with respect to the lease. (*See* Pl.'s Stmt. Uncontested Facts, Ex. BB, Sale & Purchase Agreement § 15(a)(xiv).) Despite the language of that agreement, however, the record shows that the parties did not sign the lease in the form that was attached to the sale agreement. Rather, they continued to revise the lease until at least May 26, 1998, four days after Somers' memorandum was issued. (Pl.'s Stmt. Add'l Facts ¶ 35; *id.*, Ex. JJ, Plifka Dep. at 64-65.) Because

the record establishes that the lease was not finalized when the sale agreement was executed, the fact that Somers' memorandum was issued after it was executed does not make it irrelevant to the lease.

The Bank also attacks the substance of the memorandum, arguing that it reflects only Somers' intent, not that of the Bank. The Court disagrees, for several reasons. First, the Bank identified only three people as those knowledgeable about the negotiations for or decision to enter into the lease: Shrier, Somers and Berger. (Pl.'s Resp. Defs.' Stmt. Add'l Facts ¶¶ 1-2.) It is undisputed that: (1) Somers wrote the memorandum for Berger; (2) Berger gave it to the Bank's administrative committee, of which CEO Istock was a member; and (3) the committee was required to approve the lease. (Pl.'s Resp. Defs.' Stmt. Undisputed Facts ¶¶ 27-28, 30; Defs.' Stmt Undisputed Facts, Ex. G, 5/22/98 Mem. at 1; *id.*, Ex. E, Somers Dep. at 32-34, 130-36.) The record contains no testimony from Berger, Istock or any one else who attended the administrative committee meeting as to what happened there. But the memorandum recommends that the committee approve the lease, which Somers said that it did (Defs.' Stmt. Undisputed Facts, Ex. G, 5/22/98 Mem. at 4; *id.*, Ex. E, Somers Dep. at 33-34), and there is no evidence to suggest otherwise. Given the testimony, and lack thereof, and the fact that the Bank signed the lease seven days after the memorandum was issued, the only reasonable inference that can be drawn from the record is that the Bank approved the lease as it is described in the memorandum. (*See id.*, Ex. G, 5/22/98 Mem. at 3.)

The parties' actions at and after the closing also support this inference. The closing statement for the transaction requires defendants to pay the second installment of 1997 real estate taxes and taxes accrued from January 1, 1998 to the closing date. (Pl.'s Stmt. Add'l Facts, Ex. DD,

Closing Stmt.)  The statement says the taxes "will be reprorated upon receipt of final real estate [tax]

bills for 1997 and 1998" and that:

> It is the intent of the parties that Seller shall be entitled to receive payment for all
> 1997 [and] 1998 taxes paid by the Seller and/or adjusted for at closing, whenever
> paid by or collected from tena[nts] but only to the extent actually paid to or collected
> by Purchaser, and Purchaser will pay to Seller quarterly such tax reimbursements,
> net of a proportionate share of Purchaser's out of pocket collection costs with respect
> to same, received from tenants of the Building (whether or not such tenants occupied
> space in the Building before or after closing) that are due from such tenants for such
> time periods.  *In no event shall the Seller, as tenant, pay taxes twice to Purchaser
> for the same period.*

(*Id.*) (emphasis added).  Shrier added the last sentence to that provision and, though she cannot recall

why she did so, speculated that "since the bank was in occupancy as a tenant prior to . . . the closing,

. . . it would not have wanted to have paid as a tenant any share of taxes that accrued before the new

lease began."  (Defs.' Stmt. Undisputed Facts, Ex. D, Shrier Dep. at 80; Pl.'s Resp. Defs.' Stmt.

Uncontested Facts, Ex. II, Shrier Dep. at 86.)  There is no evidence, however, that when the Bank

owned the building, it leased space to itself, let alone that any such lease passed real estate taxes

from itself as owner to itself as tenant.  (*See id.* at 86-88.)  The Bank also admits that it paid, without

protest, its share of real estate taxes from1998 through 2003 and objected to doing so in January

2004 because an outside auditor said the lease did not require the Bank to pay taxes.  (Pl.'s Resp.

Defs.' Stmt. Uncontested Facts ¶¶ 54-55; Defs.' Resp. Pl.'s Stmt. Add'l Facts ¶¶ 50, 52.)

    In short, the undisputed facts concerning the lease negotiations and closing and the parties'

conduct thereafter clearly establish that the parties intended the Bank to be responsible for its pro

rata share of taxes under the lease.  Accordingly, defendants are entitled to judgment as a matter of

law on plaintiff's claims for breach of contract, money wrongfully had and received and declaratory

relief with respect to its obligation to pay real estate taxes under the lease and on their counterclaim

for reformation. *Lima Lake*, 561 N.E.2d at 1354; *see United City of Yorkville v. Vill. of Sugar Grove*, 875 N.E.2d 1183, 1197 (Ill. App. Ct. 2007) (stating that reformation requires proof that the parties had an agreement that, because of a mutual mistake, is different from the one set forth in the document that purports to memorialize it).

Defendants also seek summary judgment on the Bank's claims for breach of the lease's covenant of good faith and fair dealing. That covenant, which is implied in every contract governed by Illinois law, is not "an independent source of [contractual] duties," but a tool for interpreting terms to which the parties expressly agreed. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992). Specifically, the covenant implies that any contract term vesting one party with discretion requires the party "to exercise that discretion reasonably and with proper motive, . . . not . . . arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.* (quotation omitted). The Bank says the lease gives defendants discretion to calculate the amount of additional charges it owes, which they have abused by charging the Bank for real estate taxes and (1) electricity used to heat and cool the basement, vacant spaces in the building and spaces used by other tenants; (2) promotional activities; and (3) municipal fines assessed against the building ("non-tax expenses").

The Court disagrees. For the reasons discussed above, any claim that defendants violated an express or implied term of the contract by charging the Bank for real estate taxes fails.

The same is true for the Bank's claims that defendants violated the implied covenant of good faith and fair dealing by charging it for non-tax expenses. The lease expressly states that the Bank is liable for "all expenses . . . paid by Landlord . . . in connection with the management, operation, insurance, maintenance and repair of the Building" except those incurred to provide electrical

service exclusively to other tenants, expenses that are, or should be, paid by other tenants, and any advertising and promotional costs. (Compl., Ex. 1, Lease § 3A(ii)(b), (m), (s).) Moreover, the lease requires defendants to give the Bank "a statement, accompanied by . . . back-up data" of the expenses for which it is liable, gives the Bank "the right to examine copies and make excerpts from and copies of Landlord's books and records" relative to any expense statement, permits the Bank to contest any statement within a year of its issuance and requires the parties to submit any contested statement to the judgment of a mutually-appointed outside accountant. (*Id.* § 3B(iv), (v).) Because the lease specifically enumerates the expenses for which defendants can charge and creates a process for resolving the Bank's objections to those charges, any contract claim based on those charges arises from the express provisions of the lease, not the implied covenant of good faith and fair dealing. Thus, defendants are entitled to judgment as a matter of law on the Bank's contract claims for breach of the covenant of good faith and fair dealing.[1]

Alternatively, the Bank seeks to recover for the non-tax expense charges on a theory of money wrongfully had and received. To the extent they seek recovery for expense payments the Bank made more than five years before it filed this suit, defendants say the claims are time-barred. *See* 735 Ill. Comp. Stat. 5/13-205 ("[A]ll civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued."); *Partpilio v. Hallman*, 510 N.E.2d 8, 11 (Ill. App. Ct. 1987) (applying five-year limitations period to a claim for money had and received).

The Bank contends that any untimely portion of its claim is saved by section 13-207 of the Illinois Code of Civil Procedure, which provides:

_____

[1]Neither party seeks judgment on the Bank's claims that defendants breached the express terms of the lease by charging it for non-tax expenses.

A defendant may plead a set-off or counterclaim barred by the statute of limitation, while held and owned by him or her, to any action, the cause of which was owned by the plaintiff or person under whom he or she claims, before such set-off or counterclaim was so barred, and not otherwise. . . .

735 Ill. Comp. Stat. 5/13-207. This statute bars a plaintiff from asserting a limitations defense to an untimely counterclaim if the counterclaim was viable when plaintiff's claim accrued. *Barragan v. Casco Design Corp.*, 837 N.E.2d 16, 24 (Ill. 2005); *see Pape v. Byrd*, 582 N.E.2d 164, 170 (Ill. 1991). The statute does not say that it applies equally to defendants, *i.e.*, that a defendant whose counterclaim is saved by section 13-207 cannot assert a limitations defense to claims asserted against it, but that is how one appellate court has interpreted it:

[W]here a defendant relies upon section 13-207 to bypass the time bar of the claims stated in his counterclaim, it would be unfair and unwarranted to nevertheless permit it to defeat the claims in the plaintiff's complaint by reason of the passing of the same statute of limitations. Consequently, to the extent that the defendants in this case have relied upon the filing of the plaintiff's action in order to preserve the viability of their counterclaim, [that reliance] . . . would revive or resuscitate Cameron General's complaint. . . .

*Cameron Gen. Hosp. v. Hafnia Holdings, Inc.*, 683 N.E.2d 1231, 1238-40 (Ill. App. Ct. 1997).

This Court is required to apply the substantive law of Illinois, which includes its statutes of limitations and associated doctrines, to this diversity suit. *Erie R. R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938)*; Hollander v. Brown*, 457 F.3d 688, 694 (7th Cir. 2006). But the law of Illinois is determined by the state supreme court, *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 635 (7th Cir. 2002), which has yet to address this issue. Thus, the Court "must make a predictive judgment as to how the supreme court . . . would decide the matter." *Id.*

The supreme court has not explicitly endorsed *Cameron*'s interpretation of section 13-207, but its decision in *Barragan* suggests that it would. In that case, Casco argued that section 13-207 did not apply to a cross-claim asserted against it because the cross-claimant was Casco's co-

defendant in the primary suit, not a plaintiff as the statute requires. *Id.* at 21. Noting that the lower courts, including *Cameron*, had "long recognized" that filing a claim constitutes a waiver of any timeliness defense to counterclaims, the court rejected Casco's argument:

> . . . [S]ection 2-401(d) of the [Illinois] Code [of Civil Procedure] deems . . . . the term "plaintiff" [to] include[] counterclaimants and third-party plaintiffs, and the term "defendant" [to] include[] third-party defendants and parties against whom relief is sought by counterclaim. Thus, when Casco filed its contribution claim against Osman, which was technically a "counterclaim" under . . . the Code, Casco became a "plaintiff" vis-a-vis Osman for purposes of section 13-207.

*Id.* at 21, 24 (quotations, citations and footnote omitted). In light of *Barragan*, this Court predicts the supreme court would hold that section 13-207 bars a defendant who uses it to "save" a time-barred counterclaim from asserting a limitations defense to the claims asserted against it.

Even if that's true, defendants say it is immaterial because they do not need section 13-207 to "save" their reformation counterclaim. In their view, the timeliness of their claim is governed by the equitable doctrine of laches, not the statute of limitations in section 13-205, the elements of which the Bank has failed to prove. *See Pyle v. Ferrell*, 147 N.E.2d 341, 344 (Ill. 1958) ("[L]aches, unlike limitations, [is] not a mere matter of time but principally a question of the inequity of permitting the claim to be enforced . . . .").

However, the supreme court has noted that laches is "no longer mechanically applied" to all equitable claims, *Sundance Homes, Inc. v. County of DuPage*, 746 N.E.2d 254, 263 (Ill. 2001), an observation borne out by various lower court cases. *See id.* (citing appellate cases in which equitable claims were subject to statutes of limitations); *In re Marriage of Braunling*, 887 N.E.2d 759, 763 (Ill. App. Ct. 2008) (assessing whether a claim for reformation of a pre-nuptial agreement was barred by the statute of limitations for claims on written contracts); *Schons v. Monarch Ins. Co. of Ohio*, 574 N.E.2d 83, 87-89 (Ill. App. Ct. 1991) (applying the same limitations period to a claim

for reformation of an insurance contract). Thus, it is not clear whether the supreme court would view the timeliness of defendants' claim through the lens of laches or limitations. Fortunately, the Court need not decide that issue because the result in this suit is the same, regardless of the theory applied. Laches applies only if defendants knew about but failed to assert their reformation claim and the delay, alone or in combination with other circumstances, has prejudiced the Bank. *Sundance*, 746 N.E.2d at 262 (quotation omitted). The Bank has offered no evidence to suggest that it has been prejudiced by the timing of defendants' claim. Accordingly, there is no genuine issue of fact as to whether the claim is barred by laches.

The statute of limitations, if any, that governs the reformation claim is the ten-year period for actions on written contracts. *See* 735 Ill. Comp. Stat. 5/13-206. However, the supreme court has not yet decided when a reformation claim based on mutual mistake accrues, and the appellate decisions are mixed. *Compare Schons*, 574 N.E.2d at 88 (holding that a reformation claim accrued when plaintiff "learned of facts which authorized her to maintain an action against defendants"), *with Benyon Bldg. Corp. v. Nat'l Guardian Life Ins. Co.*, 455 N.E.2d 246, 251 (Ill. App. Ct. 1983) (holding that a claim to reform a mortgage accrued when the mortgage was executed not when plaintiff discovered the mistake). Again, the Court must predict how the state supreme court would rule on the issue. *Allstate*, 285 F.3d at 635.

That court's decision in *Hermitage Corp. v. Contractors Adjustment Co.*, 651 N.E.2d 1132 (Ill. 1995), suggests that it would agree with *Schons*. The plaintiff in *Hermitage* alleged that defendants had breached the parties' contract and their duty of care by preparing and filing a faulty mechanic's lien. *Id.* at 1134. The lower court held that plaintiff's claims accrued when the lien was recorded, not when it discovered that the lien was defective. *Id.*

The supreme court disagreed. It said the discovery rule had been created "to avoid mechanical application of a statute of limitations in situations where an individual would be barred from suit before he was aware that he was injured." *Id.* at 1135. The court noted that "[a]n injured party may be unaware of an injury and its wrongful cause whether the action is deemed to involve tort, tort arising from contract, or other breach of contractual duty." *Id.* at 1136. Thus, the court said, it had been applied "in a wide variety of cases," by courts "more concerned with whether the underlying facts support [its] application than how the action [is] characterized." *Id.* at 1135-36. Because the plaintiffs in *Hermitage* "would have [had] no reason to know that they were injured or that this injury was wrongfully caused until they attempted to enforce the mechanics lien" and defendants had not "suggested that problems of proof ha[d] increased significantly because of the passage of time," the court held that the discovery rule applied. *Id.* at 1136.

The same is true here. Theoretically, defendants could have asserted their reformation claim on the day they executed the lease. But if they had recognized the mistake that day, they would have corrected it, obviating the need for a reformation claim. Indeed, the premise of a reformation claim is that the parties unwittingly signed an erroneous document, which is why simple negligence is not a defense. *See Korosic v. Pearson*, 36 N.E.2d 744, 745 (Ill. 1941) ("[N]egligence as will be sufficient to prevent reformation of a deed . . . must be shown to have been of such a gross nature as to amount to a violation of a legal duty."); *Marengo Fed. Sav. & Loan Ass'n v. First Nat'l Bank of Woodstock*, 527 N.E.2d 121, 125 (Ill. App. Ct. 1988) ("Negligence, standing alone, will not bar reformation because of mutual mistake in that mistake almost always presupposes negligence."); Restatement (Second) of Contracts § 157 ("A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from . . . reformation . . . ."); *id.* cmt. a ("[T]he

availability of relief would be severely circumscribed" if negligence barred reformation "because a party can often avoid a mistake by the exercise of [due] care.").

In light of *Hermitage*, and the very nature of reformation claims, the Court predicts that, like the *Schons* court, the supreme court would "find it a reasonable conclusion that in an action for reformation of a contract based upon mutual mistake, the party seeking relief cannot invoke the aid of a court to enforce his remedy until he has learned of the mistake." 574 N.E.2d at 88. There is no dispute that the Bank paid taxes without protest from 1998 until January 23, 2004, (Pl.'s Resp. Defs.' Stmt. Uncontested Facts ¶¶ 54-55; Defs.' Resp. Pl.'s Stmt. Add'l Facts ¶¶ 50, 52; *id.*, Ex. C, Letter to Valerugo from Callender of 1/23/04), and no evidence to suggest that defendants discovered the mistake earlier. Therefore, to the extent it applies, the ten-year limitations period for actions on written contracts started to run on January 23, 2004, less than five years before defendants filed their counterclaim. (*See id.*; Answer, Aff. Defenses & Countercl.)

In sum, regardless of how it is analyzed, defendants' reformation counterclaim is timely. Because defendants did not use section 13-207 to "save" the claim, they have not waived their limitations defense to the Bank's claims that they wrongfully had and received money for non-tax expenses.

That leaves the ultimate issue, whether there is a triable issue of fact as to whether the Bank's claims for money wrongfully had and received for non-tax expenses more than five years before it filed suit on May 23, 2008 are timely. *See* 735 Ill. Comp. Stat. 5/13-205; *Partpilio*, 510 N.E.2d at 11-12. Viewed favorably to the Bank, the record suggests that it may not have discovered the alleged overcharges until after the June 2003 lease audit. (*See* Defs.' Stmt. Undisputed Facts, Ex. K, Lawler Dep. at 27, 63-65.) Accordingly, the Court denies defendants' motion for summary

judgment on the claims for money wrongfully had and received for non-tax expenses before May 23, 2004.

Finally, defendants seek summary judgment on the Bank's request for prejudgment interest on any amount they recover on their express breach of contract or money wrongfully had and received claims arising from the non-tax expense charges. The Bank's request is based on the lease term that states: "[A]ny amount due to Landlord by Tenant or to Tenant by Landlord not paid when due . . . shall bear interest at ten percent (10%) per annum from the date due." (Compl., Ex. 1, Lease § 25J.) Defendants say this provision has no application because the Bank's non-tax expense claims arise under unjust enrichment principles not the terms of the lease.

Because neither party has moved for judgment on the non-tax expense claims, it is not clear whether they arise under the lease or stem from an extra-contractual source. Until that determination is made, the Court has no basis for granting defendants judgment on the Bank's request for prejudgment interest.

## Conclusion

For the reasons set forth above, there is no genuine issue of material fact as to, and defendants are entitled to judgment on: (1) the Bank's claims (a) for a declaration that the lease does not require it to pay real estate taxes; (b) that defendants breached an express term of the lease by charging it for taxes; (c) that the money defendants charged the Bank for taxes was wrongfully had and received; (d) that defendants breached the implied covenant of good faith and fair dealing by charging it for non-tax expenses; and (e) defendants' counterclaim for reformation. Accordingly, the Court denies the Bank's motion for partial summary judgment [doc. no. 60] and grants in part and denies in part defendants' motion for partial summary judgment [doc. no. 57]. Moreover, because the Court did not rely on the facts asserted in it, the Court strikes as moot defendants' motion to strike the Bank's statement of additional undisputed facts [doc. no.71].

The claims that remain in this suit are the Bank's claims: (a) for a declaration that the lease does not require it to pay for non-tax expenses; (b) that defendants breached an express lease term by charging the Bank for non-tax expenses or wrongfully had and received money for those expenses; and (c) for prejudgment interest on any amounts it recovers. At the next status hearing the Court will set a trial date.

**SO ORDERED.**                                        **ENTER:**


**January 21, 2010**

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**

22